## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| JARROD MCKINNEY, | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| THOMAS J. VILSACK, in his official capacity | § |
| as U.S. Secretary of Agriculture; ZACH | § |
| DUCHENEAUX, in his official capacity as | § |
| Administrator, Farm Service Agency, | § |
| | § |
| Defendants. | § |
| | § |

Civil Action No. 2:21-cv-00212-RWS

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 1

    I.   Section 1005 of the American Rescue Plan Act of 2021 ................................ 1

        A.  Text and Operation of Section 1005 ................................................... 1

        B.  Congressional Purpose in Enacting Section 1005 ............................... 2

        C.  The Federal Government's Response to Alleged Historical Discrimination Against Minority Farmers ................................................................................. 3

    II.  Plaintiff and Procedural History ...................................................................... 5

STANDARD OF DECISION ....................................................................................... 5

ARGUMENT .............................................................................................................. 6

    I.   Mr. McKinney Is Likely To Prevail on the Merits ........................................ 6

        A.  Section 1005 Does Not Further a Compelling Interest ....................... 6

        B.  Section 1005 Is Not Narrowly Tailored .............................................. 8

    II.  A Preliminary Injunction Is Needed To Prevent Irreparable Harm ................ 11

    III. A Preliminary Injunction Is in the Public Interest .......................................... 13

    IV. No Security Should Be Required ...................................................................... 14

CONCLUSION .......................................................................................................... 14

CERTIFICATE OF CONFERENCE .......................................................................... 15

CERTIFICATE OF SERVICE .................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena.*, 515 U.S. 200 (1995)............................................6

*Back v. Carter*, 933 F. Supp. 738 (N.D. Ind. 1996)......................................................11

*In re Black Farmers Discrimination Litig.*,
    856 F. Supp. 2d 1 (D.D.C. 2011)........................................................................4

*Builders Ass'n of Greater Chicago v. Cty. of Cook*,
    256 F.3d 642 (2001)............................................................................................9

*Campaign for S. Equal. v. Bryant*,
    64 F. Supp. 3d 906 (S.D. Miss. 2014), *aff'd*, 791 F.3d 625 (5th Cir. 2015)............11

*Cavalier ex rel. Cavalier v. Caddo Parish Sch. Bd.*,
    403 F.3d 246 (5th Cir. 2005) ..............................................................................8

*City of Richmond v. Croson Co.*, 488 U.S. 469 (1989)..............................................6, 8, 9, 10

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981) ..............................................................................13

*Def. Distributed v. United States Dep't of State*,
    865 F.3d 211 (5th Cir. 2017) ..............................................................................11

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    441 F.2d 560 (5th Cir. 1971) ..............................................................................12

*Exodus Refugee Immigr., Inc. v. Pence*,
    165 F. Supp. 3d 718 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ............11

*Grutter v. Bollinger*, 539 U.S. 306 (2003)..................................................................11

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) ..............................................................................13

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011)........................................................5

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) ................................................................................14

*Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011)................................4, 7

*Messer v. Meno*, 130 F.3d 130 (5th Cir. 1997)..........................................................6, 7

*Midwest Fence Corp. v. U.S. Dep't of Transp.*,
    840 F.3d 932 (7th Cir. 2016) ..............................................................................9

*Miller v. Johnson*, 515 U.S. 900 (1995)....................................................................6

*Miller v. Vilsack*, No. 4:21-cv-595 (N.D. Tex.)..........................................................13

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................5

*Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)..........................................................................6, 7, 8, 10

*Pigford v. Glickman*,
    185 F.R.D. 82 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000)...........................4, 5, 7

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) .............................................................................7

*Shaw v. Hunt*, 517 U.S. 899 (1996) .....................................................................6

*Walker v. City of Mesquite*,
    169 F.3d 973 (5th Cir. 1999) ..................................................................8

*Whitfield v. City of New Orleans*,
    431 F. Supp. 3d 818 (E.D. La. 2019) ...........................................................3

**Statutes**

7 U.S.C. § 2279(a)(5).........................................................................................2

7 U.S.C. § 2279(a)(6).........................................................................................2

American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ................................... *passim*

Claims Resolution Act of 2010, Pub. L. No. 111-291, § 201, 124 Stat. 3064.............................5

Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624,
    § 2501, 104 Stat. 3359 .......................................................................3

Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14011,
    122 Stat. 1651 ...............................................................................4, 5

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999,
    Pub. L. No. 105-277, § 741, 112 Stat. 2681 (1998)..............................................4

**Other Authorities**

7 C.F.R. § 760.107(b)(1)....................................................................................2

86 Fed. Reg. 28329 (May 26, 2021) ........................................................................2

*AskUSDA – American Rescue Plan of 2021* (May 14, 2021),
    https://ask.usda.gov/s/article/American-Rescue-Plan-Act-of-2021............................7

Decision and Order Granting Plaintiffs' Motion for a Temporary Restraining
    Order, ECF No. 21, *Faust v. Vilsack*, No. 1:21-cv-548
    (E.D. Wis. June 10, 2021).............................................................7, 10, 12, 13

Defs.' Eleventh Status Report, *Cantu v. United States*, No. 1:11CV00541
    (D.D.C. Oct. 26, 2015)......................................................................4

Defs.' Resp. to Mot. for Prelim. Injunct., ECF No. 22, *Wynn v. Vilsack*,
    No. 21-cv-00514-MMH-JRK (M.D. Fla. filed June 4, 2021).......................................7, 11, 13

Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong.
    ("SB 278") (introduced Feb. 8, 2021).......................................................2, 3

Order Granting Temporary Restraining Order, ECF No. 11, *Greer's Ranch Café v. Guzman*, No. 4:21-cv-00651-O (N.D. Tex. May 18, 2021) .................................................7

Press Release, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), https://www.justice.gov/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women ...................................................4

U.S. Dep't of Agric., *Socially Disadvantaged Farmers and Ranchers*, https://www.usda.gov/partnerships/socially-disadvantaged-farmers-and-ranchers ....................................................................................................................3

U.S. Dep't of Agric., *American Rescue Plan Debt Payments FAQ*, https://www.farmers.gov/americanrescueplan/arp-faq ...........................................9

U.S. Dep't of Agric., Customer Data Worksheet (form AD-2047) https://www.farmers.gov/sites/default/files/documents/AD2047-01192021.pdf. ................................................................................................................2

## INTRODUCTION

Section 1005 of the American Rescue Plan Act of 2021 provides loan assistance to a subset of farmers and ranchers based on a single characteristic: their race. It assumes that all farmers and ranchers who are Black/African American, American Indian, Alaskan Native, Hispanic/Latino, Asian American, or Pacific Islander are "socially disadvantaged," and it requires Defendants to provide them with a payment of up to 120 percent of their outstanding farm loans as of January 1, 2021. White farmers and ranchers are categorically excluded from such payments, regardless of their individual circumstances. Plaintiff Jarrod McKinney, a Texas farmer, is ineligible for loan assistance under Section 1005 because he is white.

This Court should issue a preliminary injunction. Mr. McKinney is substantially likely to succeed on the merits, a preliminary injunction is necessary to avoid irreparable harm, and both the balance-of-harms and public interest factors favor the issuance of preliminary relief.

## BACKGROUND

### I.      Section 1005 of the American Rescue Plan Act of 2021

#### A.      Text and Operation of Section 1005

Section 1005[1] directs the Secretary of Agriculture to "pay off" the outstanding farm loans[2] of each "socially disadvantaged farmer or rancher . . . in an amount up to 120 percent of the outstanding indebtedness . . . as of January 1, 2021." § 1005(a)(2). A "socially disadvantaged farmer or rancher" is "a farmer or rancher who is a member of a socially disadvantaged group."

---

[1] All citations to "Section 1005" or "§ 1005" refer to § 1005 of the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4.

[2] Qualifying farm loans include most loan types issued or guaranteed by the Farm Service Agency, including direct ownership loans, operating loans, and farm storage facility loans. *See* § 1005(a)(2), (b)(1).

§ 1005(b)(3) (incorporating the definition in 7 U.S.C. § 2279(a)(5)). A "socially disadvantaged group" is "a group whose members have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." 7 U.S.C. § 2279(a)(6).

USDA has made clear what this means: "Members of socially disadvantaged groups include . . . : American Indians or Alaskan Natives; Asians; Blacks or African Americans; Native Hawaiians or other Pacific Islanders; and Hispanics or Latinos."[3] That list mirrors USDA regulations that define the term "socially disadvantaged group."[4] It also includes every race/ethnicity recognized by USDA except for "White."[5]

## B.   Congressional Purpose in Enacting Section 1005

Congress did not include findings to explain its purpose in enacting the race-based loan assistance provisions in Section 1005, but the never-enacted Senate Bill 278, which included a similar provision, may shed light on Congressional intent. *See* Emergency Relief for Farmers of Color Act of 2021, S. 278, 117th Cong. §§ 3, 4 ("SB 278") (introduced Feb. 8, 2021). The stated purpose of SB 278 was "to address the historical discrimination against socially disadvantaged farmers and ranchers and [ ] issues relating to the Coronavirus Disease 2019 (COVID-19)." *Id.* § 4(a). Proposed findings accompanying the bill included allegations of "systemic racism" and a

---

[3] *Notice of Funds Availability; American Rescue Plan Act of 2021 Section 1005 Loan Payment (ARPA)*, 86 Fed. Reg. 28329 (May 26, 2021).

[4] *See, e.g.*, 7 C.F.R. § 760.107(b)(1) ("Socially disadvantaged groups include the following and no others unless approved in writing . . . : (i) American Indians or Alaskan Natives, (ii) Asians or Asian–Americans, (iii) Blacks or African Americans, (iv) Native Hawaiians or other Pacific Islanders, and (v) Hispanics."); *id.* § 1410.2(b) (same).

[5] *See* U.S. Dep't of Agric., Customer Data Worksheet (form AD-2047) at 1, https://www.farmers.gov/sites/default/files/documents/AD2047-01192021.pdf.

2

"pattern of discrimination at the Department of Agriculture against Black farmers, Indigenous farmers, and farmers of color." *Id.* § 2(3), (10).

To support these broad assertions, SB 278 listed an assortment of factors, from the historical removal of Native Americans from their traditional lands, to title issues arising from Black farmers' distrust of the legal system during Reconstruction and Jim Crow, to USDA's discrimination against Hispanic farmers in credit and loan transactions. *Id.* § 2(2)–(9). SB 278 did not, however, include any specific findings or examples of discrimination against farmers or ranchers who are Asian American, Hawaiian, or Pacific Islander. And despite its stated goal of "address[ing] issues relating to" COVID-19, it did not include any proposed findings about COVID-19.

### C.   The Federal Government's Response to Alleged Historical Discrimination Against Minority Farmers

For decades, there has been an extensive federal response to allegations of discrimination by USDA against minority farmers and ranchers. The 1990 Farm Bill established the Outreach and Assistance for Socially Disadvantaged Farmers and Ranchers Program (known as the "2501 Program"). *See* Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, § 2501, 104 Stat. 3359. The Program "provide[s] outreach and technical assistance for underserved farmers, ranchers, and foresters" and "has awarded 533 grants totaling more than $138 million."[6] These grants "have helped reach socially disadvantaged agricultural producers—farmers and ranchers who have experienced barriers to service due to racial or ethnic prejudice."[7]

---

[6] *Socially Disadvantaged Farmers and Ranchers*, https://www.usda.gov/partnerships/socially-disadvantaged-farmers-and-ranchers (last visited June 15, 2021). Plaintiff requests that the Court take judicial notice of all government websites cited in this motion. *Whitfield v. City of New Orleans*, 431 F. Supp. 3d 818, 823 (E.D. La. 2019) ("A court may also take judicial notice of certain matters, including public records and government websites.").

[7] *Id.*

Additionally, USDA has paid massive sums to settle class action lawsuits alleging that it engaged in lending discrimination. Perhaps best known is the *Pigford* litigation, where USDA paid out around $1 billion to a class of approximately 23,000 Black farmers under a consent decree. *See Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (approving the consent decree), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000). A subsequent class action settlement provided relief for Black farmers who were too late to file claims under *Pigford*. *See In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1 (D.D.C. 2011), as amended (Nov. 10, 2011) (approving settlement). Similarly, in *Keepseagle v. Veneman*, the court approved a class action settlement in a case brought by Native American farmers and ranchers. *See* Order, *Keepseagle v. Vilsack*, No. 99-cv-3119 (D.D.C. Apr. 28, 2011). And the Department of Justice and USDA have established an administrative process to resolve the claims of Hispanic farmers and ranchers who asserted that they were discriminated against when seeking USDA farm loans.[8]

Congress has strongly supported these settlement efforts. In 1998, Congress suspended application of the two-year statute of limitations, allowing claimants to assert decades-old instances of discrimination. *See* Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681 (1998). The 2008 Farm Bill stated that it was the "sense of Congress" that all pending discrimination claims and class actions brought against USDA should be "resolved in an expeditious and just manner." Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 14011, 122 Stat. 1651.

---

[8] *See* Press Release, *Department of Justice and USDA Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers* (Feb. 25, 2011), https://www.justice.gov/opa/pr/department-justice-and-usda-announce-process-resolve-discrimination-claims-hispanic-and-women; *see also* Defs.' Eleventh Status Report, *Cantu v. United States*, No. 1:11CV00541 (D.D.C. Oct. 26, 2015) (explaining that the administrative process had approved 3,210 claims made by women and Hispanic farmers and ranchers).

Accordingly, that bill (1) imposed a moratorium on acceleration and foreclosure proceedings against farmers or ranchers who alleged discrimination by USDA, and (2) appropriated $100 million to settle the *Pigford* discrimination claims. *Id.* § 14012. Just two years later, Congress appropriated an additional $1.15 billion for that purpose. Claims Resolution Act of 2010, Pub. L. No. 111-291, § 201, 124 Stat. 3064.

## II.   Plaintiff and Procedural History

Jarrod McKinney is a part-time farmer in Naples, Texas, where he raises 60 pairs of cattle. Declaration of Jarrod McKinney ¶¶ 2, 4. Mr. McKinney follows in the footsteps of his grandfather and great-grandfather who were also farmers. *Id.* ¶ 3. Each night, after he finishes his day job at an insurance agency, Mr. McKinney works on his farm from 5 p.m. to 10 p.m. *Id.* Like many other farmers, he has suffered economic harm from the COVID-19 pandemic. *Id.* ¶ 8. Mr. McKinney has an ownership loan from the USDA Farm Service Agency, which would otherwise be eligible for forgiveness under Section 1005. *Id.* ¶ 5. However, Mr. McKinney is excluded from this loan forgiveness because of the color of his skin. *Id.* ¶ 8.

## STANDARD OF DECISION

To secure a preliminary injunction, a plaintiff must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). The last two factors, "assessing the harm to the opposing party and weighing the public interest[,] . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.      Mr. McKinney Is Likely to Prevail on the Merits

Mr. McKinney will likely be able to prove that Defendants' implementation of the "socially disadvantaged" provisions of Section 1005 violates both the Fifth Amendment's Due Process Clause and the Administrative Procedure Act. Both the statute and the USDA are clear that Section 1005 distributes benefits on the basis of race. "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Messer v. Meno*, 130 F.3d 130, 135–36 (5th Cir. 1997) (quotations omitted). To sustain Section 1005's racial discrimination, Defendants must show that the statute's racial classification both (1) furthers a compelling governmental interest, and (2) is narrowly tailored to further that interest. *Adarand Constructors, Inc. v. Pena.*, 515 U.S. 200, 220 (1995). They cannot do either.

### A.      Section 1005 Does Not Further a Compelling Interest

The Supreme Court has recognized only one relevant interest compelling enough to justify racial classifications: remedying the effects of past or present de jure discrimination. *Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720–22 (2007). This interest requires more than a "mere assertion that . . . remedial action is required." *Miller v. Johnson*, 515 U.S. 900, 922 (1995). Defendants must show that Congress had "a strong basis in evidence to conclude that remedial action was necessary." *Shaw v. Hunt*, 517 U.S. 899, 910 (1996) (quotations omitted). Defendants cannot make that showing here.

***First***, "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *City of Richmond v. Croson Co.*, 488 U.S. 469, 498 (1989). Congress provided no findings as to how many minority farmers and ranchers have suffered racial discrimination in any "relevant market." *Id.* at 502. And it failed to credit the federal government's significant and

sustained efforts to remedy its past discrimination.[9] As discussed above, *supra*, Background Part I.C., the 2501 Program has awarded over $100 million in grants in an effort to assist "farmers and ranchers who have experienced barriers to service due to racial or ethnic prejudice." And the federal government has paid out over $2.4 billion to settle and resolve *Pigford*, *Keepseagle*, and other litigation regarding alleged loan discrimination against Black, Native American, and Hispanic farmers and ranchers. Congress has supported these efforts by suspending statutes of limitation and allocating funds to settle discrimination claims. These sustained efforts remedied discrimination against many farmers and ranchers across the country. "Any continued use of race must be justified on some other basis." *Parents Involved*, 551 U.S. at 721.

**Second**, the assertion that "socially disadvantaged farmers and ranchers have faced systemic discrimination with cumulative effects"[10] does not provide a compelling interest to sustain Section 1005. The Supreme Court has long rejected the use of racial preferences to combat "systemic injustice" because it was "an amorphous concept of injury that may be ageless in its reach into the past." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (controlling opinion of Powell, J.). And the Fifth Circuit has insisted on "some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Messer*, 130 F.3d at 136 (citations omitted); *see also* Order, ECF

---

[9] In other cases involving this issue, Defendants have relied upon statements by individual legislators, statistical disparities, and other evidence that they believe provide a compelling interest for Section 1005. *See Wynn v. Vilsack*, No. 21-cv-00514-MMH-JRK, Defs.' Resp., ECF No. 22 at 18–39 (M.D. Fla. filed June 4, 2021). A federal court in Wisconsin recently considered the same evidence and held that it did not provide a compelling interest for Section 1005. *See* Decision and Order Granting Plaintiffs' Motion for a Temporary Restraining Order, *Faust v. Vilsack*, No. 1:21-cv-548, ECF No. 21 at 4–6 (June 10, 2021, E.D. Wis.). The Order is attached as Exhibit 1.

[10] *AskUSDA – American Rescue Plan of 2021* (May 14, 2021), https://ask.usda.gov/s/article/American-Rescue-Plan-Act-of-2021.

No. 11, *Greer's Ranch Café v. Guzman*, No. 4:21-cv-00651-O (N.D. Tex. May 18, 2021) (granting TRO against the implementation of a similar program because Congress had failed to identity the "industry specific evidence" that is necessary to show "a strong basis in evidence").

### B.   Section 1005 Is Not Narrowly Tailored

Even if there were a compelling interest that could justify a race-based loan assistance program, a racial classification is so suspect that it may be legitimate only as "a last resort to achieve a compelling interest." *Parents Involved*, 551 U.S. at 790 (Kennedy, J., concurring in part and concurring in the judgment). As the Fifth Circuit has explained, this involves a searching examination to test whether the government's "race-conscious remedy [is] framed to address the *exact* effects and harms of the discrimination at issue." *Walker v. City of Mesquite*, 169 F.3d 973, 982 (5th Cir. 1999) (emphasis added). Section 1005's race-based classification fails narrow tailoring for three reasons.

*First*, the rigid and categorical nature of Section 1005's loan assistance program shows that it is not narrowly tailored. Both the Supreme Court and the Fifth Circuit have warned that strict race-based quotas cannot be narrowly tailored to any compelling interest. *Croson*, 488 U.S. at 507–08; *Cavalier ex rel. Cavalier v. Caddo Parish Sch. Bd.*, 403 F.3d 246, 261 (5th Cir. 2005). That is primarily because rigid quotas are over-inclusive—they dole out benefits even to those members of the favored group who were never discriminated against. Here, *every* farmer or rancher who is a racial minority qualifies for loan forgiveness—regardless of evidence of need or past discrimination.

That is a marked contrast with the federal contracting preference for "disadvantaged business enterprises" (DBEs), which allows members of the disfavored group an avenue to prove their social disadvantage. The Seventh Circuit held that this distinction makes a difference, so far as narrow tailoring is concerned, because this avenue permits "individualized determinations" of

disadvantage and thus "requires states to extend benefits only to those who are actually disadvantaged." *Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 945–46 (7th Cir. 2016). By contrast, Section 1005's rigid racial classification is both over- and under-inclusive. Regardless of the actual circumstances of any individual farmer, a minority farmer is eligible for loan assistance, but a white farmer is not.

**Second,** Section 1005 is not narrowly tailored because of its "random inclusion of racial groups." *Croson*, 488 U.S. at 506. Farmers and ranchers who are members of any racial group recognized by USDA other than "White" qualify for loan assistance under Section 1005, regardless of whether there is evidence that group members have suffered racial discrimination in farm loan administration.[11] This "laundry list of favored minorities" includes several that "have never been subject to significant discrimination" by USDA. *Builders Ass'n of Greater Chicago v. Cty. of Cook*, 256 F.3d 642, 647 (2001). This "suggests"—if not conclusively establishes—"that perhaps [Congress's] purpose [in enacting Section 1005] was not in fact to remedy past discrimination." *Croson*, 488 U.S. at 506.

Further, the benefit extended to minority farmers (loan forgiveness) does not target the problem described in SB 278 (discrimination against farmers in the distribution of farm loans). Section 1005's loan assistance program can only apply to those who have *successfully acquired* farm loans, not those who were *unable* to obtain farm loans due to discrimination.[12] That

---

[11] As one example, Section 1005 provides loan assistance for Asian Americans and Pacific Islanders, for whom SB 278 provides no particularized evidence of discrimination.

[12] *See* U.S. Dep't of Agric., *American Rescue Plan Debt Payments FAQ*, https://www.farmers.gov/americanrescueplan/arp-faq (last updated May 21, 2021) ("If you do not have a current farm loan, you are not eligible for debt relief under Section 1005 . . . .").

blunderbuss approach necessarily excludes those who would have suffered most from lending discrimination, making it an exceedingly poor fit for remedying the problem alleged in SB 278.

*Third,* the narrow tailoring analysis requires Defendants to show that "the way in which they have employed individual racial classifications is necessary to achieve their stated ends." *Parents Involved*, 551 U.S. at 733. Yet Defendants cannot show that Section 1005's exclusive reliance on race is "indispensable" to solving of the problems perceived by Congress. *Id*. at 734. If Congress believed, for example, that differences in farm size between minority and non-minority farmers disproportionately affected minority farmers, it should have met that challenge with race-neutral solutions (e.g., aid to small farms).

As a federal district court in Wisconsin explained, "Congress can implement race-neutral programs to help farmers and ranchers in need of financial assistance, such as requiring individual determinations of disadvantaged status or giving priority to loans of farmers and ranchers that were left out of the previous pandemic relief funding. It can also provide better outreach, education, and other resources." Decision and Order Granting Plaintiffs' Motion for a Temporary Restraining Order, *Faust v. Vilsack*, No. 1:21-cv-548, ECF No. 21 at 6 (June 10, 2021, E.D. Wis.). Even if these alternatives would have required additional investigation or the dedication of additional administrative resources, an "interest in avoiding the bureaucratic effort necessary to tailor remedial relief . . . cannot justify a rigid line drawn on the basis of a suspect classification." *Croson*, 488 U.S. at 508. Congress's failure to engage in "serious, good faith consideration of workable race-neutral alternatives" that would remedy many of the disparities identified by the defendants

is further proof that Section 1005 is not narrowly tailored. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003).[13]

## II.      A Preliminary Injunction Is Needed to Prevent Irreparable Harm

Section 1005 inflicts irreparable harm on Mr. McKinney by violating his right to equal protection under the law. Where a plaintiff alleges an ongoing deprivation of his constitutional rights, courts generally presume irreparable harm. *Def. Distributed v. United States Dep't of State*, 865 F.3d 211, 214 (5th Cir. 2017) ("[I]rreparable harm occurs whenever a constitutional right is deprived, even for a short period of time."). The Fifth Circuit has indicated that this is true for all constitutional claims*, id.*, and at least one district court in this Circuit has explicitly applied that standard to equal protection injuries. *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 950 (S.D. Miss. 2014), *aff'd,* 791 F.3d 625 (5th Cir. 2015) (finding presumptive irreparable harm with a violation of the Equal Protection Clause). "This rule is based on the belief that equal protection rights are so fundamental to our society that any violation of those rights causes irreparable harm." *Back v. Carter*, 933 F. Supp. 738, 754 (N.D. Ind. 1996). After all, "governmental discrimination has consequences well beyond those that money could ever rectify." *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016). Because Mr. McKinney is substantially likely to succeed on his claim that Section 1005 violates his constitutional rights to equal protection, the irreparable harm requirement is satisfied. *Def. Distributed*, 865 F.3d at 214.

---

[13] In a similar case, the government argued that race-neutral methods have been ineffective at reducing racial disparities in "the number, amounts, and servicing of USDA loans for minority farmers as compared to non-minority farmers." *Wynn v. Vilsack*, No. 21-cv-00514-MMH-JRK, Defs.' Resp., ECF No. 22 at 32 (M.D. Fla. filed June 4, 2021). But without evidence of ongoing racial discrimination, Congress is prohibited from using racial classifications to remedy statistical disparities until minority farmers and white farmers reach economic parity. Congress may use race-neutral methods to help farmers most in need of assistance (and those methods might disproportionately benefit minority farmers), but it may not discriminate on the basis of race.

In addition, Mr. McKinney faces irreparable harm because "socially disadvantaged" farmers who have their farm loans forgiven under Section 1005 will most likely deplete the $4 billion that Congress expected to dole out before this case is decided on the merits, leaving Mr. McKinney without the opportunity to also obtain loan forgiveness absent a substantial expansion of the program. *See Faust*, No. 1:21-cv-548, ECF No. 21 at 9 (citing favorably plaintiffs' estimate that an expansion of Section 1005's debt payments to all farmers and ranchers would cause the size of the program to balloon to 400 billion dollars).[14]

A preliminary injunction is therefore necessary to preserve the status quo and ensure that Mr. McKinney is able to secure available relief. *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."). *See Faust*, No. 1:21-cv-548, ECF No. 21 at 9 ("Once a loan is forgiven, it cannot easily be undone.").[15]

These injuries are not just irreparable, but also imminent. USDA has already started to forgive loans and has sent out thousands of offer letters. *See Faust*, No. 1:21-cv-548, ECF No. 21 at 7. For that reason, the United States District Court for the Eastern District of Wisconsin recently

---

[14] The USDA has indicated that it will begin processing payments at the push of a button. Once the USDA has begun forgiving loans, any court order which merely restrains future loan forgiveness will no longer provide Mr. McKinney with full relief. Not granting a preliminary injunction will therefore irreversibly foreclose the mostly likely form of relief.

[15] The district court in *Faust* also noted that even though Congress has theoretically apportioned "such sums as may be necessary to pay for the program," a specified portion of the $1.9 trillion American Rescue Plan has been allocated to farm loan assistance, and "the 8,580 farmers and ranchers who were sent offer letters represent approximately 49% of the loans that will be forgiven under the program." *Faust*, No. 1:21-cv-548, ECF No. 21 at 7. Accordingly, it is entirely possible that in the absence of an injunction, all of the funds currently allocated to the program may be depleted. *Id.* at 8.

issued a temporary restraining order preventing Defendants from continuing to process payments. But such an order is by definition temporary. And even while the order is in place, the court explained that Defendants would "not be prevented from identifying eligible recipients, mailing notices, accepting and reviewing applications, responding to inquiries and providing guidance regarding the program, and making other determinations." *Faust*, No. 1:21-cv-548, ECF No. 21 at 8. Accordingly, once the order is lifted, Defendants will be ready to immediately send out payments.[16]

### III.    A Preliminary Injunction Is in the Public Interest

The irreparable harms that Mr. McKinney will suffer without a preliminary injunction outweigh any harm that the preliminary injunction would cause Defendants. When a constitutional right hangs in the balance, even a temporary loss of that right usually trumps the harm to Defendants. This is because "arbitrary and capricious actions that interfere with the exercise of fundamental rights" are not in the public interest. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338–39 (5th Cir. 1981). In contrast, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014).

---

[16] There are pending motions for a preliminary injunction urging courts in various jurisdictions to enjoin Defendants from enforcing the socially disadvantaged provisions of Section 1005. The cases include one in another district in the Fifth Circuit. *See Miller v. Vilsack*, No. 4:21-cv-595, ECF No. 17 (N.D. Tex. filed Jun. 2, 2021). The other motions should serve as no obstacle to this Court's independent jurisdiction to decide this case. This is especially true here because Defendants has argued (and presumably will argue on appeal) that any relief should apply only to Plaintiff. *See Wynn v. Vilsack*, No. 21-cv-00514-MMH-JRK, Defs.' Resp. Br., ECF No. 22 at 40.

## IV.    No Security Should Be Required

"The amount of security required pursuant to Rule 65(c) is a matter for the discretion of" this Court. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Indeed, the Court "may elect to require no security at all." *Id.* There is no need for a bond or other security in this case.

## CONCLUSION

The Motion for Preliminary Injunction should be granted.

DATED: June 17, 2021.

Respectfully submitted,

PACIFIC LEGAL FOUNDATION

  s/ Wencong Fa

Wencong Fa (Lead Attorney)
Texas Bar No. 24087487
(Pro Hac Vice)
Joshua P. Thompson
Cal. Bar No. 250955
Christopher M. Kieser
Cal. Bar No. 298486 (Pro Hac Vice)
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
Email: WFa@pacificlegal.org
Email: JThompson@pacificlegal.org
Email: CKieser@pacificlegal.org

Glenn E. Roper
Colo. Bar No. 38723(Pro Hac Vice)
1745 Shea Center Dr., Suite 400
Highlands Ranch, CO 80129
Telephone: (916) 419-7111
Fax: (916) 419-7747
Email: GERoper@pacificlegal.org

*Counsel for Plaintiff Jarrod McKinney*

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule CV-7(h), Plaintiff's counsel submits this certificate of conference. Counsel has not entered an appearance for Defendants. However, Defendants are represented by Emily Newton and Kyla Snow, attorneys with the U.S. Department of Justice, in related cases pending in other jurisdictions. On June 16, 2021, Plaintiff's counsel Wencong Fa and Glenn Roper conferred with Ms. Newton and Ms. Snow in person. Ms. Newton has indicated that this motion is opposed.

       s/ Wencong Fa
       Wencong Fa

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2021, I caused the foregoing to be served via U.S. Mail

(certified) on the following parties:

Thomas J. Vilsack, Secretary
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

Zach Ducheneaux, Administrator
Farm Service Agency
U.S. Department of Agriculture
1400 Independence Avenue, S.W.
Washington, DC 20250

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Acting U.S. Attorney Nicholas J. Ganjei
United States Attorney's Office
c/o Civil Process Clerk
550 Fannin, Suite 1250
Beaumont, TX 77701

                                       s/ Wencong Fa
                                         Wencong Fa